UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
D.G., a child with a disability, individually and
by his parent and next friend, P.O.,

                      Plaintiff,                  3:09-CV-1064

       v.

COOPERSTOWN CENTRAL SCHOOL
DISTRICT,

                      Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                    OF COUNSEL:

LAW OFFICE OF ANDREW K. CUDDY     JASON H. STERNE, ESQ.
Attorneys for Plaintiff
5888 Main Street
Williamsville, New York 14221

FERRARA, FIORENZA, LARRISON,     SUSAN T. JOHNS, ESQ.
BARRETT & REITZ P.C.
Attorneys for Defendant
5010 Campuswood Drive
East Syracuse, New York 13057

DAVID N. HURD
United States District Judge

## MEMORANDUM-DECISION and ORDER

## I.  INTRODUCTION

      Plaintiff P.O. ("plaintiff") brings this action on behalf of her son D.G., a child with a

disability, against defendant Cooperstown Central School District ("defendant" or "District")

under the Individuals with Disabilities Education Act ("IDEA").  20 U.S.C. §§ 1400-87.

Specifically, plaintiff appeals a decision of the New York Education Department's State

Review Officer ("SRO") who found that the individualized education plan ("IEP") recommended by the District for the 2007-08 and 2008-09 school years offered D.G. a free appropriate public education ("FAPE") under the IDEA.[1]

The District moves for summary judgment under Federal Rule of Civil Procedure 56. Plaintiff opposes. Plaintiff cross-moves for summary judgment under Rule 56. The District opposes. Oral argument was heard on October 8, 2010, in Utica, New York. Decision was reserved.

## II. BACKGROUND[2]

### A. D.G.'s Educational History Prior to the IHO and SRO Decisions

D.G., born in 1994, was first classified in May 2004 by the District's Committee on Special Education ("CSE") as learning disabled with deficits in the areas of reading and written expression.[3]

---

[1] Plaintiff also appeals on the ground that the SRO failed to order the District to provide tuition reimbursement and to fund D.G.'s education at The Gow School for the remainder of his school attendance entitlement under the IDEA. After finding that the District offered D.G. a FAPE, the Impartial Hearing Officer ("IHO") declined to make a finding on the second and third prongs of the reimbursement decision, namely whether The Gow School was an appropriate placement and whether the equities favored reimbursement. However, that "ground" for appeal is more properly treated as a request for relief. In other words, the sole legal question in this case is whether D.G. was denied a FAPE for the two school years in question; if he was denied a FAPE, plaintiff's request for reimbursement and expenses for the remainder of D.G.'s schooling will be addressed in turn. Finally, plaintiff also seeks attorneys' fees pursuant to the IDEA. See 20 U.S.C. § 1415.

[2] For a more extensive account of the facts underlying this action, see the administrative decisions from which it arose. See Johns Aff., Exs. 3 ("SRO decision") & 4 ("IHO decision"), Dkt. No. 13-3.

[3] In both her motion papers and at oral argument, plaintiff articulated the District's alleged long standing failure to address D.G.'s problems and help him succeed. Particularly, plaintiff points out that D.G. attended the District from kindergarten through third grade and that the District failed him on many occasions during that time period. Whether these allegations are true or not, they are not relevant to our inquiry of whether the 2007-08 and 2008-09 IEPs offered D.G. a FAPE.

**1.  The 2004-05 School Year**

On May 7, 2004, the CSE developed an IEP for D.G. to receive a special education program and services from the District.  The CSE recommended the IEP be implemented in the beginning of the 2004-05 school year.  The 2004-05 school year IEP provided for daily resource room instruction in a "mixed setting" and a number of program modifications including testing accommodations.[4]

Plaintiff alleges that by the beginning of the 2004-05 school year she had lost faith in the District's ability to teach D.G. so she enrolled D.G. at the Brookwood School[5] where he attended during the 2004-05 school year.

During D.G.'s fourth grade year at Brookwood, the 2004-05 school year, D.G. was placed in a class with a teacher experienced in teaching students with dyslexia.  During the year he worked on his reading skills up to three and one-half hours per day in a one-on-one setting.  D.G. expressed an interest in returning to the District's elementary school for his fifth grade year.  In response plaintiff contacted the elementary school's principal who recommended to plaintiff that D.G. was receiving more services at Brookwood than he would at the District and thus recommended he remain at Brookwood.

**2.  The 2005-06 School Year**

The CSE met on August 31, 2005, to develop an IEP for the 2005-06 school year.  The IEP provided for D.G. to receive daily resource room instruction in a "mixed setting" thirty-six minutes a day and other modifications similar to the 2004-05 IEP.

---

[4] The "mixed setting" resource room is a point of contention.  Plaintiff claims the "mixed setting" is inappropriate and in violation of New York law.

[5] The Brookwood School is a Montessori-based school which does not provide special education services and is not a residential school.

D.G. began the 2005-06 school year, his fifth grade year, at the District.  He attended the District's school for the first two days of the year but according to plaintiff he felt overwhelmed and unable to keep up academically.  D.G. then returned to Brookwood for the remainder of the 2005-06 school year.

In light of D.G.'s continued difficulties with reading, on December 22, 2005, plaintiff obtained an private evaluation by a licensed psychologist at the Upstate Cerebral Palsy (UCP) Center.  The evaluation established that D.G. was dyslexic and recommended a "prescriptive reading program with an experienced reading consultant."  Sterne Aff. ¶ 48, Dkt. No. 16-1.

It is undisputed that D.G. made progress in many areas while attending the Brookwood School including improving his reading decoding skills.  While D.G. received intensive reading instruction at Brookwood, including a private one-on-one reading tutor during 2005-06, Brookwood did not provide him with any instruction in math or writing during the 2005-06 school year.  As a result, his writing did not progress but his reading skills improved to the third grade level.

### 3.  <u>The 2006-07 School Year</u>

D.G. continued at Brookwood for his sixth grade year.  In October and November 2006 D.G. traveled with plaintiff to Rochester, New York to receive Davis Dyslexia Correction training.

An IEP for the 2006-07 school year was apparently not drafted until plaintiff expressed an interest in D.G. returning to the District's school for the second half of the 2006-07 year.  In October 2006 plaintiff began meeting with the CSE Chairperson.  On October 24 plaintiff forwarded the UCP evaluation to the District's CSE Chairperson.  During

the course of meetings with the District, plaintiff communicated her concerns regarding the District's programs to aid students with dyslexia in light of the UCP recommendations. Plaintiff advocated for the use of a multisensory, systematic and cumulative approach that was Orton-Gillingham based.  Specifically, plaintiff recommended the Wilson Reading Program.  The District represented to plaintiff that two teachers would be trained in the Wilson program.  Plaintiff claims that based on this promise she agreed to return D.G. to the District.

In November 2006 D.G. was reevaluated by the District's school psychologist Susan E. Rys, M.S., C.A.S.  Ms. Rys reviewed D.G.'s school records and social history as provided by plaintiff and administered a variety of tests.[6]  She found D.G. to have average cognitive and comprehension skills and cognitive strengths in skills requiring visual processing.  D.G.'s long-term retrieval skills fell within the low average to average range and his basic reading skills were below average.  One assessment, the QRI-4, indicated that D.G. read third grade material on an instructional level, which according to Ms. Rys, meant that D.G. could be instructed profitably using third grade reading material.

Upon learning from the plaintiff that D.G. planned to return to the District in January 2007 the District prepared an IEP for the remainder of the 2006-07 school year.  The IEP, prepared on December 21, 2006, provided for D.G. to receive daily special education instruction in reading in a class not to exceed fifteen students, five days per week for forty minute sessions, and resource room services in a "mixed setting" three days per week for forty minute sessions.  The IEP contained similar program and testing modifications from the

---

[6] The tests included the Kaufman Assessment Battery for Children-2nd edition (K-ABC-II), Curriculum Based Assessment (letters, sounds, DIBELS), Gray Oral Reading Tests-4th edition (GORT-4), and Qualitative Reading Inventory-4th edition (QRI-4).

previous year's IEP and included training to school personnel regarding learning disabilities. A transition plan was also developed which provided for D.G. to remain at Brookwood in the morning and receive his special education services at the District in the afternoon.  The transition plan was designed to last six to eight weeks at which time the CSE would consider increasing D.G.'s time at the District.

On January 16, 2007, D.G. enrolled as a sixth grade student at the District.  The transition plan was never implemented and instead, at plaintiff's request, D.G. attended the District full-time.  While at the District D.G. received special reading instruction.  The IEP provided for reading instruction in a fifteen-to-one reading class.  The record however established that while teaching the reading class, D.G.'s teacher was simultaneously instructing three other students in a five-to-one resource room.

D.G.'s teachers reported that he was making progress in the reading class.  In January 2007 D.G. took the sixth grade New York State English Language Arts Assessment. His score, despite being on the low end, indicated that his English Language Arts skills met New York State learning standards.  D.G. attended the District for approximately five weeks but ceased attendance in February 2007.[7]  According to plaintiff D.G. felt he could not keep up with the pace and returned to Brookwood in February 2007.[8]

By letter dated February 27, 2007, the District scheduled a CSE meeting to review D.G.'s progress.  The meeting was not held and was rescheduled at plaintiff's request.  On or

---

[7] D.G. did not return to the District's school after February 13, 2007, and effective February 26, 2007, he formally withdrew from the District.

[8] D.G. ultimately left Brookwood and received home schooling by plaintiff until the end of the 2006-07 school year.

about March 3 plaintiff applied for D.G. to attend The Gow School.[9]  Plaintiff then requested by e-mail on March 25 that the rescheduled CSE meeting be postponed.  It is undisputed that as of March 25 plaintiff had not advised the District of her decision to apply to The Gow School.

On April 14 plaintiff requested an independent educational evaluation (IEE) of D.G. at the District's expense.  Plaintiff stated that D.G.'s school reports showed he had made little or no progress in school over the previous seven years and that testing had shown his IQ was within the normal range.

Plaintiff continued to communicate with The Gow School during the remainder of April 2007 to make arrangements for D.G. to attend Gow during the 2007-08 school year.  D.G. was tested for admission to Gow on April 16 and less than a week later plaintiff accepted The Gow School's offer.  The parties dispute when plaintiff signed the Enrollment Reservation Contract with The Gow School but both agree it was before the CSE met on August 21 to develop the 2007-08 IEP.

The IEE, requested by plaintiff, was conducted by Roseanne J. Westgate-Pesola, Ph.D., over eight days in May and June 2007 at the District's expense.  Dr. Westgate-Pesola summarized that D.G.'s oral expression skills were average, his academic skills were low average, and his fluency with academic tasks were low average.  She concluded that his academic knowledge and ability to apply academic skills were both within the average range

---

[9] The Gow School is a residential school located in South Wales, New York, approximately thirty miles south of Buffalo, and approximately two hundred forty miles from the District.  It is a school solely for boys in grades seven through twelve who have a language-based learning disability.  Typical enrollment at The Gow School is one hundred forty-five students.  While not relevant to this inquiry, it should be noted The Gow School is not approved by New York State for the education of students with disabilities.

and his performance in reading comprehension was high average.  D.G. was average in basic reading skills and math reasoning but low average in broad reading and written expression.  Additionally, Dr. Westgate-Pesola found that D.G. was low average in mathematic calculation and basic writing skills and his knowledge of phoneme-grapheme relationships was low average.

### 4. **The 2007-08 School Year**

Dr. Westgate-Pesola attended the August 21 CSE meeting to assist in preparing D.G.'s 2007-08 IEP.  The CSE concluded that D.G. was capable of fully participating in the seventh grade curriculum but needed intensive, direct instruction in basic reading skills using a systematic, multisensory approach.  He also needed academic support for written expression, math, and other skills.  The 2007-08 IEP contained annual goals to address reading and spelling of high frequency sight words, oral reading fluency, use of spell check, mastery of multiplication facts, organizing and editing written work, spelling non-phonetic words, and solving math word problems.  Although not a special education service, the District offered D.G. Academic Intervention Services to provide instruction in the math skills that he was not taught while he attended the Brookwood School.

The IEP provided daily instruction in a reading class not to exceed fifteen students five days per week for forty minute sessions and resource room services in a "mixed setting" five days per week for forty minute sessions.  Additional accommodations included preferential seating, a peer note taker, typed assignments, decreased length of academic tasks by thirty percent, and other modifications.  The CSE planned that, other than the

special education reading class and resource room support, D.G. would attend general education classes at his grade level during the 2007-08 school year.[10]

Despite these recommendations, plaintiff's then attorney informed the District at the IEP meeting that the District could not meet D.G.'s needs with the proposed level of service. Plaintiff indicated to the CSE that D.G. needed a residential special education environment in order to succeed.

As a result, D.G. attended The Gow School for the 2007-08 school year.

### 5. **The 2008-09 School Year**

On May 28, 2008, the CSE convened to prepare D.G.'s IEP for 2008-09.  Plaintiff and staff from The Gow School participated in the meeting by conference call.  The CSE recommended daily special education instruction in basic reading and language arts in a class of fifteen or fewer students and daily resource room instruction, five times per week for forty minutes a session, for academic support.  The District also offered D.G. Academic Intervention Services for math.  The IEP included the prior year's test accommodations as well as additional assistive technology supports.  The CSE again advised that the services be implemented in the general education environment.  The IEP also indicated that staff would be provided training on dyslexia.  The CSE meeting minutes indicate that a consensus was reached on all abilities, needs, goals, and program modifications; however plaintiff denies that the services were agreed to by all.  Plaintiff's then attorney informed the CSE that the

---

[10] The District's general education classes for the 2007-08 school year had between fifteen and eighteen students.

District could not meet D.G.'s needs and that D.G. would be returning to The Gow School for the 2008-09 school year.[11]

In August 2008, plaintiff, still unhappy with what she perceived to be D.G.'s lack of progress, requested a due process hearing before an IHO.  Plaintiff sought tuition reimbursement for The Gow School and alleged that the IEPs for the 2007-08 and 2008-09 school years were inappropriate.

### B.  The IHO's Decision

On April 14, 2009, the IHO issued his decision finding that defendant's recommendations in the 2007-08 and 2008-09 IEPs offered D.G. a free appropriate public education in the least restrictive environment as required by the IDEA.  Because he found the District offered D.G. a FAPE for the school years at issue, the IHO denied plaintiff's request for tuition reimbursement and thus did not specifically address the appropriateness of The Gow School or whether equity would support an award of reimbursement.

The hearing was held over the course of five days in December 2008 and January 2009.  Plaintiff alleged the following deficiencies with respect to both IEPs at issue: 1) the IEPs developed were wholly inappropriate, did not meet D.G.'s special needs, and did not provide appropriate services; 2) the IEPs did not contain the requisite data concerning D.G.'s level of performance; 3) the recommended services were substantially inappropriate, inadequate, and inconsistent with the available evaluations and observations; 4) the IEPs did not provide adequate school personnel support for educating a child with dyslexia; and 5) the

---

[11] Subsequent to the May 28, 2008, CSE meeting, D.G. was retested was Dr. Westgate-Pesola in August 2008.  The evaluation results and D.G.'s progress as of August 2008 are only relevant if we reach the inquiry of whether The Gow School is an appropriate placement for D.G.

IEPs did not provide services to address D.G.'s self-esteem issues.  Plaintiff also attacked the District's representation that two teachers would be trained in a scientifically researched-based reading program for dyslexic students, namely the Wilson program, and the District's failure to conduct appropriate evaluations in all areas of D.G.'s suspected disability.  Additionally, with respect to the 2008-09 IEP, plaintiff alleged that the goals were neither appropriate nor measurable.

### 1. The 2007-08 IEP

The IHO rejected plaintiff's claim that the 2007-08 IEP did not meet D.G.'s needs and did not provide appropriate services.  In doing so, the IHO addressed plaintiff's contention that the "mixed-setting" resource room was inappropriate.  The IHO acknowledged that the special class designation on the IEP provided for D.G. to receive specialized reading instruction in a "mixed setting."  He noted that regulations provide that specialized instruction can be best accomplished in a self-contained setting and concluded that "[t]he IEP needs to be written in a more precise manner, so as to define at what point of departure would the child move from a self contained class to a mixed setting."  Johns Aff., Ex. 4, IHO Decision, p. 22.  However the IHO found that the goals, as written, addressed nearly all of D.G.'s needs identified in the evaluations and in testimony presented at the hearing.  He found the goals to be measurable using both subjective and objective means.  The IHO indicated that he would add a goal more specific to address D.G.'s spelling deficiencies -- however such an addition would not in itself invalidate the IEP.

The IHO also rejected plaintiff's arguments regarding the Wilson program.  At the hearing plaintiff argued that teachers at the District did not have the expertise to implement the IEPs.  Plaintiff testified that she urged the District to use the Wilson program and that the

District represented to her that school personnel would be trained in the Wilson program.  It is undisputed that the District did not ultimately use the Wilson program.  The hearing record established that the District arranged for personnel to be trained on the program but training did not occur because of weather related reasons.  The CSE Chairperson testified regarding the training that the District's special education teachers had received in reading interventions.  The training, based upon the work of Dr. Donna Scanlon and Dr. Sally Shaywitz as well as the Preventing Academic Failure program, included programs based on the Orton-Gillingham method and other multisensory programs.  The IHO found that the plaintiff failed to present evidence that the Wilson program was the only effective reading program to address D.G.'s needs.

The IHO also found that the evaluations used in the development of the August 2007 IEP were the most recent available evaluations and that the plaintiff, D.G.'s teacher from Brookwood, and an independent evaluator fully participated in the August 2007 CSE meeting.  Further, he concluded that the evaluations presented at the hearing assessed D.G.'s specific areas of educational need, that each goal which addressed his unique need was discussed at the August 2007 meeting, that all revisions of the IEP took place at the meeting, and that there was no disagreement among the participants as to D.G.'s present levels of performance.

Based on the above, the IHO concluded that the District offered D.G. a free appropriate public education for the 2007-08 school year and denied plaintiff's request for reimbursement.

### 2. **The 2008-09 IEP**

In addressing the appropriateness of the 2008-09 IEP, the IHO found that the IEP reflected D.G.'s needs in detail and was consistent with his progress reports, extensive evaluations including the IEE, and classroom observation at The Gow School.  As to plaintiff's advocacy of the Wilson program during the 2008-09 school year, the IHO concluded that while the Wilson program might prove successful for D.G., the program used at Gow was a variation of the Orton-Gillingham methodology and Gow staff testified that a multisensory approach was not unique to a particular methodology.  The IHO found that the District's teachers were trained in the Donna Scanlon methodology and used Preventing Academic Failure and Merrill Reading Programs, which were considered multisensory.

For the above reasons, the IHO concluded that the District offered D.G. a free appropriate public education for the 2008-09 school year and accordingly denied plaintiff's request for reimbursement for her unilateral placement of D.G. at The Gow School.

### C. **The SRO's Decision**

Plaintiff appealed the IHO's determination to the SRO.  On June 22, 2009, the SRO dismissed plaintiff's appeal and upheld the IHO's determination that the 2007-08 and 2008-09 IEPs provided D.G. with a free appropriate public education.  After determining that the District offered D.G. a FAPE for both school years at issue, the SRO found it unnecessary to analyze the second and third prongs of the Burlington test for tuition reimbursement, including whether The Gow School was an appropriate placement for D.G. and whether the equities favored reimbursement.

On appeal, plaintiff made a litany of arguments to the SRO including alleged errors by the IHO in acknowledging testimony, admitting evidence submitted after deadlines, and

not being impartial.  Plaintiff also argued that the IHO's decision was not supported by specific facts and attacked the IEPs at issue on several bases including many of those raised to the IHO.  The District opposed and asserted that the petition for review should be dismissed as defective.

Preliminarily, the SRO rejected the District's procedural arguments and declined to dismiss the petition on those grounds.  The SRO found that the IHO's decision was supported by specific facts including citations to the hearing record.  He rejected plaintiff's claim that the IHO was not impartial and disagreed with plaintiff that the IHO should have heard evidence from school years prior to 2007-08.  The SRO found plaintiff's contention that the District's teachers were inadequately trained to be without merit based on the reading and resource room teacher's qualifications adduced at the hearing.

The SRO noted that if D.G. had attended the District in the 2007-08 school year, he would have been the third student in the proposed fifteen-to-one reading class and the teacher would have addressed D.G.'s skills using the Preventing Academic Failure program.  According to the hearing record, this program was a scientifically researched-based methodology of the Orton-Gillingham type.  He also found that if D.G. had attended the District he would have been placed in a resource room with no more than five students.

Additionally, with respect to the "mixed setting" resource room indicated in the 2007-08 IEP, the SRO found that the hearing record did not demonstrate that such a setting would have denied D.G. a FAPE even in light of inconsistent testimony from the CSE Chairperson and the special education teacher.[12]

---

[12] One of the District's special education teachers who participated in the development of the 2007-08 IEP testified at the hearing that the "mixed setting" indicated on the IEP was a typographical

(continued...)

Regarding the 2008-09 school year, a second special education teacher, trained in multisensory methods, testified that D.G. would have been the only student in the fifteen-to-one reading class and that he would have been in a resource room with three other eighth grade students.  The teacher indicated that she used an Orton-Gillingham based multisensory, interactive reading program and she testified about various methods and exercises she would have used to address D.G.'s goals.  With regard to plaintiff's contention that the goals and objectives in the IEPs were not measurable or consistent with D.G.'s academic ability, the SRO indicated that the evaluative criteria listed for each goal was indicated with the percentage of accuracy required of D.G. to master the goal.  The IEPs provided additional criterion including the level of assistance allowed and the number of trial or work samples required.

Based on the above, and for additional reasons not discussed here but explained in detail in the SRO's decision, the SRO found the District's recommended programs for the 2007-08 and 2008-09 school years would have conferred educational benefits on D.G. and would have offered him a free appropriate public education in the least restrictive environment.

The SRO dismissed plaintiff's appeal and plaintiff subsequently filed this action in September 2009.

---

[12](...continued)
error.  However the District's CSE Chairperson acknowledged that the IEP provided for a "mixed setting" and that a "mixed setting" program was not consistent with the regulatory construct of New York because resource room support is supposed to be provided solely in a resource room.

## III. <u>DISCUSSION</u>

### A. <u>Motion for Summary Judgment in IDEA Cases</u>

IDEA cases employ a different legal standard than traditional summary judgment motions because "the existence of a disputed issue of material fact will not defeat the motion." <u>J.R. v. Bd. of Educ. of the City of Rye Sch. Dist.</u>, 345 F. Supp. 2d 386, 394 (S.D.N.Y. 2004). Instead, federal courts must conduct an independent judicial review of the administrative decisions based upon the preponderance of the evidence. <u>Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley</u>, 458 U.S. 176, 205, 102 S. Ct. 3034, 3050 (1982); <u>Cerra v. Pawling Cent. Sch. Dist.</u>, 427 F.3d 186, 191-92 (2d Cir. 2005). This examination should include evidence presented at the administrative proceedings and any additional evidence submitted to the District Court. <u>Grim v. Rhinebeck Cent. Sch. Dist.</u>, 346 F.3d 377, 380 (2d Cir. 2003). Nevertheless, the IDEA places substantial limitations on the judicial review of state administrative decisions. <u>Id.</u> (citing <u>Rowley</u>, 458 U.S. at 204-08, 102 S. Ct. at 3050-52).

The Supreme Court has explained that the preponderance of the evidence standard "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." <u>Rowley</u>, 458 U.S. at 206, 102 S. Ct. at 3051. Accordingly, courts are required to give "due weight" to the administrative findings, while keeping in mind that they "lack the 'specialized knowledge and experience' necessary to resolve 'persistent and difficult questions of educational policy'". <u>Id.</u> at 208, 102 S. Ct. at 3052 (quoting <u>San Antonio Indep. Sch. Dist. v. Rodriguez</u>, 411 U.S. 1, 42, 93 S. Ct. 1278, 1301 (1973)). Deference is particularly appropriate when the State

Hearing Officer's review has been thorough and careful.  See Walczak v. Fla. Union Free Sch. Dist., 142 F. 3d 119, 129 (2d Cir. 1998).

The IDEA establishes a two-part inquiry for courts reviewing state administrative decisions: (1) whether "the State complied with the procedures set forth in the Act[;]" and (2) whether the school district's IEP is "reasonably calculated to enable the child to receive educational benefits[.]"  Rowley, 458 U.S. at 206-07, 102 S. Ct. at 3051 (footnotes omitted).

### B.  Defendant's Preliminary Grounds for Dismissal

Defendant argues the complaint should be dismissed based on a lack of subject matter jurisdiction, lack of standing, and failure to exhaust administrative remedies because the caption has been poorly drafted to mistakenly reflect that only D.G. is a party.  This argument lacks merit.  The complaint and accompanying papers clearly identify P.O., the parent, as a party to this action.  Should the case survive summary judgment motions, the caption could be amended to cure any ambiguity.

### C.  Defendant's Compliance with the IDEA

Plaintiff alleges that the SRO erred in upholding the IHO's decision who found that defendant offered D.G. a free appropriate public education as required by the IDEA.  Plaintiff argues the District did not offer a FAPE for the 2007-08 and 2008-09 school years because the District did not have an appropriate reading program for dyslexic students in place and because neither IEP was reasonably calculated to meet D.G.'s needs.[13]  Defendant argues

---

[13] Plaintiff further argues the appropriateness of The Gow School; however that issue need not be addressed at this stage.

the SRO properly determined, based on the testimony of the District's teachers and the

record before it, that the District procedurally and substantively complied with the IDEA.

The overall purpose of the IDEA is "to ensure that all children with disabilities have

available to them a free appropriate public education that emphasizes special education and

related services designed to meet their unique needs . . . [and] to ensure that the rights of

children with disabilities and parents of such children are protected."  20 U.S.C. §

1400(d)(1)(A)-(B).

A free appropriate public education is defined as follows:

> [S]pecial education and related services that-- (A) have been provided at
> public expense, under public supervision and direction, and without
> charge; (B) meet the standards of the State educational agency; (C)
> include an appropriate preschool, elementary school, or secondary school
> education in the State involved; and (D) are provided in conformity with
> the individualized education program required under section 1414(d) of
> this title.

20 U.S.C. § 1401(9).  Typically, a FAPE is offered when: 1) the school district complies with

the procedural requirements of the IDEA; and 2) the IEP developed by way of those

procedures is "reasonably calculated to enable the child to receive educational benefits."

Rowley, 458 U.S. at 206-07, 102 S. Ct. at 3051; see Cerra v. Pawling Cent. Sch. Dist., 427

F.3d 186, 192 (2d Cir. 2005).  A district offers a FAPE "by providing personalized instruction

with sufficient support services to permit the child to benefit educationally from that

instruction."  Rowley, 458 U.S. at 203, 102 S. Ct. at 3049.

The "IDEA does not itself articulate any specific level of educational benefits that

must be provided through an IEP."  Walczak, 142 F.3d at 130.  The statute ensures an

"appropriate" education, "not one that provides everything that might be thought desirable by

loving parents."  Id. at 132.  Therefore, a district is not required to furnish "every special

service necessary to maximize each handicapped child's potential." <u>Cerra</u>, 427 F.3d at 195

(quoting <u>Rowley</u>, 458 U.S. at 199, 102 S. Ct. at 3047).  "Rather, a school district fulfills its

substantive obligations under the IDEA if it provides an IEP that is 'likely to produce progress,

not regression,' and if the IEP affords the student with an opportunity greater than mere

'trivial advancement.'" <u>Cerra</u>, 427 F.3d at 195 (quoting <u>Walczak</u>, 142 F.3d at 130).

     If a state fails in its obligations to provide a FAPE to a child with a disability, the

parents may enroll the child in a private school and seek retroactive reimbursement for the

cost of the private school from the state.  <u>Sch. Comm. of Burlington v. Dep't of Educ. of</u>

<u>Mass.</u>, 471 U.S. 359, 370 (1985).  A parent is entitled to tuition reimbursement when: 1) the

proposed IEP was inadequate to afford the child an appropriate public education; and 2) the

private schooling obtained by the parents was appropriate to the child's needs.  <u>Id.</u>; <u>see also</u>

<u>Frank G. v. Bd. of Educ. of Hyde Park</u>, 459 F.3d 356, 363 (2d Cir. 2006).  If there is an

affirmative finding on both prongs, equitable considerations relating to the reasonableness of

the action taken by the parent are relevant.

     Plaintiff does not argue that the District failed to comply with the procedural

requirements of the IDEA; thus, the sole question is whether the District complied with the

substantive requirements -- whether the 2007-08 and 2008-09 IEPs were reasonably

calculated to enable D.G. to receive educational benefits.

    **1.  <u>Adequacy of the 2007-2008 IEP</u>**

     The bulk of plaintiff's allegations that the IEPs were inadequate focus on plaintiff's

belief that the District did not have an appropriate reading program for dyslexic students,

namely an Orton-Gillingham based multisensory, direct instruction program.   Plaintiff

specifically urged the implementation of the Wilson program which the District did not utilize.

The record reflects that the District did have other multisensory programs in place, just not the specific one that plaintiff recommended.

Plaintiff claims that there were no baselines in the 2007-08 IEP to gauge D.G.'s progress and that baselines were not recorded for word problems nor math goals on which D.G. would allegedly work.  Plaintiff criticizes the language regarding staff training which was the same as in the previous year's IEP -- training which was again not provided to the District's personnel.  Plaintiff also alleges that the "mixed setting" resource room services were inappropriate.

The record is to the contrary regarding plaintiff's contention that the 2007-08 IEP did not include D.G.'s baselines.  The 2007-08 IEP took into account the data provided by the IEE and results from tests administered in November and December 2006, and January and May 2007.  These evaluations were the most recent available.

The IEP was prepared during a meeting that was attended by the parents, the District's CSE Chairperson, middle school principal, guidance counselor, school psychologist, special education teacher, regular education teacher, an additional parent member, and D.G.'s teacher from the Brookwood School, in addition to two friends of the parent, an independent clinical psychologist, and an independent evaluator.  With the testimony by D.G.'s Brookwood teacher, the independent evaluator, and the District's special education teachers, D.G.'s present levels of performance were clearly included in the IEP.

The CSE explored various options for D.G.  Resource room support alone was rejected as it would not meet D.G.'s needs in the area of basic reading.  Primary instruction in a self-contained program was deemed too restrictive.  Plaintiff's proposed private

residential placement at The Gow School was also deemed too restrictive as D.G. would not have instruction with typical peers.

Dr. Westgate-Pesola testified at the hearing that she agreed with the description of D.G.'s present levels of performance as stated on the IEP prepared at the August 21, 2007, meeting. She testified that she agreed with the 2007-08 annual goals listed on the IEP and that the goals were consistent with her recommendations.

The goals provided in the IEP were sufficient to provide D.G.'s proposed teachers with directions about the CSE's baselines from which progress could be measured. The IEP goals provided enough information for teachers to meet D.G.'s needs and to enable him to be involved in and progress in the general education curriculum.

As plaintiff points out, the record established that with respect to daily instruction in a reading class, D.G.'s reading teacher was simultaneously instructing three other students in a five-to-one resource room. The teacher testified that she believed she was providing the reading instruction D.G. needed. It is unclear from the record if the combined resource room and special reading class was the result of plaintiff deciding on short notice to reenroll D.G. full-time at the District, theoretically making the arrangement a temporary one.

Plaintiff's claim that the "mixed setting" program invalidates the IEP must also be rejected. The CSE Chairperson testified at the hearing that:

> Mixed setting means that, it was our philosophy that students would develop skills in isolation in the resource rooms. And when we wrote "mixed settings," so that then, when they were ready to generalize skills, the special ed teacher could take them to the classroom and work on applying strategies, if it was appropriate.

Transcript of Administrative Hearing at 238. She further explained the distinction "means that their resource instruction . . . could be provided both in the special ed classroom and in

the general ed classroom." Id. at 239.  According to New York regulations, specialized instruction can best be accomplished in a self-contained setting. N.Y. COMP. CODES R. & REGS. tit. 8, § 200.6(h)(4).  However, "[a] school district may include integrated co-teaching services in its continuum of services.  Integrated co-teaching services means the provision of specially designed instruction and academic instruction provided to a group of students with disabilities and nondisabled students." Id. § 200.6(g).  The District's goal, as testified by the CSE Chairperson, of generalizing skills and incorporating students into the mainstream classroom is a legitimate one.  As the IHO correctly noted, the IEP should provide more direction as to when D.G. would be ready to transition into the general education classroom. The failure to provide such instruction however does not invalidate the IEP as a whole.

Plaintiff's contention that the SRO erred in finding that the 2007-08 IEP was inappropriate is unavailing.  The record, including the testimony and exhibits provided at the hearing, demonstrate that the IEP for the 2007-08 school year was adequate.

### 2.  Adequacy of the 2008-2009 IEP

The 2008-09 school year IEP was also based on the available data and evaluations presented to the District.  Nearly all of the same individuals from the prior year's meeting were in attendance plus staff from The Gow School where D.G. had been in attendance for the prior school year.  The CSE reviewed the IEP's description of D.G.'s levels of performance including an April 2008 achievement test, an observation of D.G. at The Gow School, and a May 2008 progress report from Gow.  The Gow School and plaintiff agreed with the CSE's description of D.G.'s levels of performance and educational needs and agreed with the goals proposed during the May 28, 2008, meeting.  The CSE again

considered consultant teacher support, resource support, and the parent's proposed placement at Gow.

Plaintiff does not specifically address how the SRO is in error other than to reallege that the 2007-08 and 2008-09 IEPs did not offer D.G. a free appropriate public education. Instead of drawing our attention to any inadequacies in the District's reading programs, plaintiff focuses on the superiority of the Wilson program and the quality of education and opportunities at The Gow School.  We do not disagree that The Gow School may have provided D.G. a quality education; however that does not require us to conclude that the District's programs or IEPs were inadequate.

It is clear that in reaching his decision the SRO relied on the evidence presented at the hearing including the dozens of exhibits presented by the parties and the detailed and well-reasoned decision of the IHO.  The SRO also made independent conclusions.  There is no indication that the SRO was in error in dismissing plaintiff's appeal.

For the reasons discussed above, the programs offered for both the 2007-08 and 2008-09 school years would have conferred educational benefits on D.G. and would have met his special education needs.  Therefore, the District offered D.G. a free appropriate public education for both the 2007-08 and 2008-09 school years.

### 3.  <u>Appropriateness of The Gow School and the Balance of Equities</u>

Because the 2007-08 IEP and 2008-09 IEP were reasonably calculated to meet D.G.'s needs and thus offered D.G. a free appropriate public education, plaintiff has not satisfied the first prong under the <u>Burlington</u> reimbursement test requiring that the IEP be inadequate.  Thus, there is no need to address the appropriateness of The Gow School or whether equity would support an award of reimbursement.

Accordingly, defendant's motion for summary judgment will be granted and plaintiff's cross-motion for summary judgment will be denied.

## IV. __CONCLUSION__

To summarize, the preponderance of the evidence shows that the IEPs developed for the 2007-08 and 2008-09 school years were reasonably calculated to provide D.G. with educational benefits.  A wealth of evidence concerning D.G.'s reading deficiencies was presented before the IHO and SRO.  There was extensive testimony, evaluations, and test results presented as to D.G.'s academic challenges.  There was also testimony supporting the detailed goals and instructions provided in the 2007-08 and 2008-09 IEPs suggesting that the goals listed were measurable and appropriate.

D.G. only attended the District through June 2004--the end of his third grade year. Since that time, he attended the District's schools for only two days in September 2005 and seventeen instructional days in January and February 2007.

While the IHO and SRO determinations are subject to independent judicial review, a close examination of both the thirty-one page IHO decision and seventeen page SRO decision demonstrate that both determinations were substantiated by evidence in the record and testimony by the District's staff as to how the IEPs would have been implemented had D.G. enrolled at the District during the school years at issue.

The purpose of the IDEA is to ensure that all children with disabilities have a free appropriate public education available to them, however, school districts are not required to furnish every special service necessary to maximize each child's potential or provide everything that might be thought desirable by loving parents.

Both IEPs at issue were developed by the Cooperstown Central School District's Committee on Special Education after taking into account D.G.'s test results, progress, plaintiff's concerns, and consideration of the various options available in the District. While plaintiff may have preferred the District to employ the Wilson program, the District did not fail to provide D.G. a free appropriate public education by utilizing other proven methods.

Defendant's motion for summary judgment will be granted and plaintiff's cross-motion for summary judgment will be denied because the State Review Officer properly concluded that the District's recommended programs for the 2007-08 and 2008-09 school years would have conferred educational benefits on D.G. and would have offered him a free appropriate public education as required by the Individuals with Disabilities Education Act.

Therefore, it is

ORDERED that

1.  The State Review Officer's decision is AFFIRMED;

2.  Defendant's motion for summary judgment is GRANTED;

3.  Plaintiff's cross-motion for summary judgment is DENIED; and

4.  The complaint is DISMISSED in its entirety.

The Clerk is directed to enter judgment accordingly.

IT IS SO ORDERED.

_____
United States District Judge

Dated: October 29, 2010
        Utica, New York.